**IN THE UNITED STATES DISTRICT COURT FOR THE**
**NORTHERN DISTRICT OF FLORIDA**
**TALLAHASSEE DIVISION**


**MICHAEL BRONSON,**

      **Petitioner,**

**vs.**

                           **CASE NO. 4:08cv444-SPM/WCS**

**RUSSELL HOSFORD,**
**WARDEN,**

      **Respondent.**

_____/


## REPORT AND RECOMMENDATION

This is a petition for writ of habeas corpus filed by Michael Bronson pursuant to

28 U.S.C. § 2254. Doc. 1. Petitioner challenges his convictions for burglary of a

dwelling with a person assaulted and felony battery causing great bodily harm, and

combined sentence of 15 years in prison, in the Circuit Court of the Second Judicial

Circuit, in and for Gadsden County, Florida, case number 04-123CFA. *Id.* Petitioner

brings one claim, that his attorney was ineffective for failure to call a witness. *Id.*, p. 4.

Respondent filed an answer and the record in paper form (Exhibits A through N),

doc. 12, and a supplement to the record in electronic form, doc. 25 (Exhibits O and P).

Hereafter references to Exhibits will be to those supplied with docs. 12 and 25.

Petitioner filed a traverse.  Doc. 26.  Respondent concedes that the petition was timely

filed.  Doc. 12, p. 5.

**Section 2254 Standard of Review**

"An application for a writ of habeas corpus may be denied on the merits,

notwithstanding the failure of the applicant to exhaust the remedies available in the

courts of the State."  28 U.S.C. § 2254(b)(2).[1]  But habeas corpus relief may be granted

only if Petitioner has properly exhausted his federal claims in state court.  § 2254(b)(1)

and (c).  To do so the federal claim must be fairly presented to the state court, to give

the State the opportunity to pass upon and correct alleged violations of federal rights.

*See* Baldwin v. Reese, 541 U.S. 27, 29, 124 S.Ct. 1347, 1349, 158 L.Ed.2d 64 (2004)

(citations omitted); Duncan v. Henry, 513 U.S. 364, 365-366, 115 S.Ct. 887, 888, 130

L.Ed.2d 865 (1995).  While it is not necessary that the petitioner cite "book and verse" of

the Constitution, the state court must be alerted to the fact that a federal constitutional

claim is raised.  Duncan, 513 U.S. at 365-366, 115 S.Ct. at 888 (citations omitted); *see*

*also* McNair v. Campbell, 416 F.3d 1291, 1303 (11th Cir. 2005) (holding that a petitioner

must "do more than scatter some makeshift needles in the haystack of the state court

record") (citations omitted).

The petitioner also "must give the state courts one full opportunity to resolve any

constitutional issues by invoking one complete round of the State's established

---

[1] If no constitutional claims are raised, then §2254 is inapplicable and the exhaustion inquiry is irrelevant.  Engle v. Isaac, 456 U.S. 107, 120, n. 19, 102 S.Ct. 1558, 1567, n. 19, 71 L.Ed.2d 783 (1982).

appellate review process." O'Sullivan v. Boerckel, 526 U.S. 838, 845, 119 S.Ct. 1728, 1732, 144 L.Ed.2d 1 (1999); Pope v. Rich, 358 F.3d 852, 854 (11th Cir. 2004) (applying this one complete round requirement to state collateral review process as well as direct appeal). If a claim is not fairly presented through one complete round of state court review and review is no longer available in state court, it is procedurally defaulted and the petitioner must demonstrate cause and prejudice for the default *or* a miscarriage of justice. Coleman v. Thompson, 501 U.S. 722, 750, 111 S.Ct. 2565, 115 L.Ed.2d 640 (1991); McCleskey v. Zant, 499 U.S. 467, 494-95, 111 S.Ct. 1454, 1470-71, 113 L.Ed.2d 517 (1991).[2]

For claims that were properly exhausted and adjudicated in state court, this court's review is limited. "[A] determination of a factual issue made by a State court shall be presumed to be correct," and Petitioner has "the burden of rebutting the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1); Bui v. Haley, 321 F.3d 1304, 1322 (11th Cir. 2003) (citing the statute, footnote omitted). Moreover, as to a factual issue adjudicated by the state court, Petitioner must show that the adjudication "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." § 2254(d)(2); 321 F.3d at 1322 (citing the statute). Section 2254(d)(2) is satisfied "only if it is shown by clear and convincing evidence that the state court's

---

[2] The miscarriage of justice exception applies only to extraordinary cases, where a constitutional violation has probably resulted in conviction of an innocent person. McCleskey v. Zant, 499 U.S. 467, 494-95, 111 S.Ct. 1454, 1470-71, 113 L.Ed.2d 517 (1991). *See also* House v. Bell, 547 U.S. 518, 536-537, 126 S.Ct. 2064, 2076-2077, 165 L.Ed.2d 1 (2006) (explaining what must be shown to demonstrate actual innocence as a "gateway" to review of a defaulted claim).

presumptively correct factual findings do not enjoy support in the record." <u>Lomholt v. Iowa</u>, 327 F.3d 748 , 752 (8th Cir. 2003) (citing § 2254(e)(1), other citation omitted).

As to legal findings, a petitioner is entitled to federal habeas relief only if the state court's adjudication of the merits of the federal claim "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." § 2254(d)(1). "[C]learly established Federal law, as determined by the Supreme Court of the United States," refers only to holdings (rather than *dicta*) of the Supreme Court, but decisions of lower federal courts may be considered to the extent that they demonstrate how those courts applied Supreme Court holdings. <u>Hawkins v. Alabama</u>, 318 F.3d 1302, 1309 (11th Cir. 2003) (citations omitted) ("The decisions of other federal circuit courts (and our decisions for that matter) are helpful to the AEDPA inquiry only to the extent that the decisions demonstrate that the Supreme Court's pre-existing, clearly established law compelled the circuit courts (and by implication would compel a state court) to decide in a definite way the case before them."). *See also*, <u>Carey v. Musladin</u>, 549 U.S. 70, 74-77, 127 S.Ct. 649, 653-654, 166 L.Ed.2d 482 (2006) (§ 2254 refers to holdings, rather than *dicta*, of the Supreme Court, collecting cases to show that "[r]eflecting the lack of guidance from this Court, lower courts have diverged widely in their treatment of defendants' claims.").

The "contrary to" and "unreasonable application" clauses of § 2254(d)(1) have independent meanings. <u>Williams v. Taylor</u>, 529 U.S. 362, 404-406, 120 S.Ct. 1495, 1519-1520, 146 L.Ed.2d 389 (2000); <u>Bell v. Cone</u>, 535 U.S. 685, 694, 122 S.Ct. 1843, 1850, 152 L.Ed.2d 914 (2002) (citing <u>Williams</u>).

> Under the "contrary to" clause, a federal habeas court may grant the writ if
> the state court arrives at a conclusion opposite to that reached by [the
> Supreme] Court on a question of law or if the state court decides a case
> differently than this Court has on a set of materially indistinguishable facts.
> Under the "unreasonable application" clause, a federal habeas court may
> grant the writ if the state court identifies the correct governing legal
> principle from this Court's decisions but unreasonably applies that
> principle to the facts of the prisoner's case.

Williams v. Taylor, 529 U.S. at 412-413, 120 S.Ct. at 1523; 535 U.S. at 694, 122 S.Ct.

at 1850. *See also*, Panetti v. Quarterman, 551 U.S. 930, 953-954, 127 S.Ct. 2842,

2858-2859, 168 L.Ed.2d 662 (2007) (discussing the unreasonable application standard)

(citing Williams, other citations omitted).

"Avoiding these pitfalls [described in Williams v. Taylor] does not require citation

of our cases – indeed, it does not even require *awareness* of our cases, so long as

neither the reasoning nor the result of the state-court decision contradicts them." Early

v. Packer, 537 U.S. 3, 8, 123 S.Ct. 362, 365, 154 L.Ed.2d 263 (2002) (emphasis in

original). Further, "whether a state court's decision was unreasonable must be

assessed in light of the record the court had before it." Holland v. Jackson, 542 U.S.

649, 652, 124 S.Ct. 2736, 2738, 159 L.Ed.2d 683 (2004).

The basic law governing ineffective assistance of counsel claims was clearly

established in Strickland v. Washington, 466 U.S. 668, 690, 694, 104 S.Ct. 2052, 2066,

2068, 80 L.Ed.2d 674 (1984). Williams, 529 U.S. at 405-406, 120 S.Ct. at 1519-1520;

Bell, 535 U.S. at 694-695, 122 S.Ct. at 1850. Under the two part test of Strickland,

Petitioner must demonstrate both deficient performance and prejudice to the outcome.

To establish deficient performance, a petitioner "must identify the acts or

omissions of counsel that are alleged not to have been the result of reasonable

professional judgment."  466 U.S. at 690, 104 S.Ct. at 2066.  In reviewing the claim,

"counsel is strongly presumed to have rendered adequate assistance and made all

significant decisions in the exercise of reasonable professional judgment."  466 U.S. at

690, 104 S.Ct. at 2066.  "[B]ecause counsel's conduct is presumed reasonable, for a

petitioner to show that the conduct was unreasonable, a petitioner must establish that

no competent counsel would have taken the action that his counsel did take."  Chandler

v. United States, 218 F.3d 1305, 1315 (11th Cir. 2000) (en banc), *cert. denied,* 531 U.S.

1204 (2001).  *See also* Fugate v. Head, 261 F.3d 1206, 1217 (11th Cir. 2001) (citing

Chandler).  There are no rigid requirements or absolute duty to investigate a particular

defense.  Fugate v. Head, 261 F.3d at 1217.

> Indeed, "[c]onsidering the realities of the courtroom, more is not always
> better.  Stacking defenses can hurt a case.  Good advocacy requires
> 'winnowing out' some arguments, witnesses, evidence, and so on, to
> stress others."

*Id.*

For prejudice, Petitioner must show "a reasonable probability that, but for

counsel's unprofessional errors, the result of the proceeding would have been different.

A reasonable probability is a probability sufficient to undermine confidence in the

outcome."  466 U.S. at 694, 104 S.Ct. at 2068.

Although Strickland explained the performance and prejudice prongs of analysis,

"there is no reason . . . to approach the inquiry in the same order or even to address

both components of the inquiry if the defendant makes an insufficient showing on one."

466 U.S. at 697, 104 S.Ct. at 2069.  "If it is easier to dispose of an ineffectiveness claim

on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed." *Id.*

A state court's adjudication of an ineffective assistance claim does not satisfy the "contrary to" language of § 2254(d)(1) even if this court might have applied <u>Strickland</u> differently. <u>Williams</u>, 529 U.S. at 406, 120 S.Ct. at 1520; <u>Bell</u>, 535 U.S. at 698, 122 S.Ct. at 1852. To determine whether the state court's adjudication was an "unreasonable application" of <u>Strickland</u>, Petitioner "must do more than show that he would have satisfied *Strickland's* test if his claim were being analyzed in the first instance . . . . Rather, he must show that the [state court] applied *Strickland* to the facts of his case in an objectively unreasonable manner." <u>Bell</u>, 535 U.S. at 698-699, 122 S.Ct. at 1852 (*citing* <u>Williams</u>). "[T]he most important point is that an *unreasonable* application of federal law is different from an *incorrect* application of federal law." <u>Williams v. Taylor</u>, 529 U.S. at 410, 120 S.Ct. at 1522.

**Legal Analysis**

**Evidence at trial**

Petitioner was accused of forcing his way into the apartment of Shayla James and severely battering Letitia Hall. Hall was pregnant.

Hall testified that she had been going with Petitioner as his girl friend for two or three years. Ex. B (trial transcript), p. 17. They then broke up. *Id.* She moved to Atlanta, but on February 21, 2004, she returned to Chattahoochee, in Gadsden County, to visit friends and family. *Id.*, pp. 18-19. She was with Yolanda Nealy (her cousin) and Shayla James (a friend), when she saw Petitioner on the street. *Id.*, p. 20. Petitioner

said he wanted to talk, and Hall said no. *Id.*, pp. 20-21. Hall, Nealy, and James then went to James's apartment. *Id.*, p. 21.

About 30 minutes later, Hall heard someone beating on the door. *Id.*, p. 22. She could tell it was Petitioner by his voice. *Id.*, p. 23. She hid in a back bathroom to avoid talking with Petitioner. *Id.*, p. 22. She heard James say "she ain't here, she ain't here." *Id.* She then hid in a bedroom and tried to block the bedroom door with her body. *Id.*, p. 24. Petitioner hit and kicked the door and Hall fell back, hitting her head on the wall. *Id.* Hall said that Petitioner "just started punching me in my face and kicking me and pulling me by my hair." *Id.* Hall testified that Petitioner hit her about 50 times. *Id.*, p. 25. When law enforcement was called, Petitioner suddenly stopped beating Hall and fled. *Id.*, p. 25. Hall testified that she had a broken bone under her right eye and she had blurred vision. *Id.*, p. 27.

On cross examination, Hall said that on August 20, 2004, some months after this assault, she was at her sister's house. *Id.*, p. 32. Shayla James came over. *Id.*, p. 33. Hall was then asked whether she and James had a conversation about money, and an objection as to hearsay was sustained. *Id.*

Yolanda Nealy corroborated Hall's testimony about meeting Petitioner on the street, that Petitioner wanted to talk with her. *Id.*, pp. 39-40. She said she went into Shayla James's apartment and James locked the door. *Id.*, p. 41. Nealy had seen Petitioner out in the parking lot. *Id.* Nealy said that Petitioner "came knocking and asked was she there and Shayla James told him she wasn't there." *Id.* She said that James unlocked the door, told Petitioner that Hall was not there, and "he pushed her out of the way and walked on in." *Id.*, p. 44. "He just pushed her into the arm chair." *Id.*

She described how Petitioner kicked his way through the bedroom door and beat Hall with his hands and fists.  *Id.*, pp. 45-46.  She said that Hall was pregnant at the time of this assault.  *Id.*, p. 52.

Shayla James testified that she, Nealy, and Hall came into her home on the day in question, after they had seen Petitioner on the street.  *Id.*, pp. 66-67.  She said that Petitioner knocked on the door, asked if Hall were there, she said no, and "he pushed my arm out of the way."  *Id.*, p. 66.  She told him several times that Hall was not there, and when she opened the door and said it again, Petitioner said "well, she's in there and he pushes my arm out of the way and went straight to the bedroom."  *Id.*, p. 68. James said she did not invite Petitioner in.  *Id.*, p. 69.  She then described the beating of Hall.  *Id.*, pp. 69-70.  On cross examination, James said that Petitioner kept knocking on the door, she kept telling him that Hall was not there, and she opened the door because she "was tired of the knocking."  *Id.*, p. 75.  She was holding the door half open, and Petitioner pushed her arm away.  *Id.* and p. 76.

On cross examination, James was also asked whether she had had a conversation on August 24, 2004, when Hall was present, and she said yes.  *Id.*, p. 77. She said the conversation was at the apartment of Alicia Davis.  *Id.*  The topic of the conversation was about "dropping the charges on Michael Bronson."  *Id.*, pp. 77-78. James said: "Alicia [Davis] had told me he [Petitioner] was going to pay me to drop the charges, and I was like, no, I don't want to do it."  *Id.*, p. 78.  She was then asked whether she made any statements with Hall present that "you [James] would drop the charges if Mr. Bronson paid you [James] some money?"  *Id.*  The answer to this not entirely clear, and seems to have the verb "told" missing.  The answer as it appears in

the transcript is: "Yes, I Letitia that but I told Alicia I won't but I had told Letitia." *Id.*

James was then asked the following questions:

> Q     But you did say you would drop the charges?
>
> A     Yeah, I told Letitia.
>
> Q     If he paid you money?
>
> A     Yes.
>
> Q     Why did you say that?
>
> A     I don't know.  I was thinking about living.
>
> Q     Did you tell her that you would tell the truth if he paid you
>        some money?
>
> A     No.

*Id.*  James said that "they say he was going to pay me like a hundred dollars," "and that

wasn't enough money." *Id.*, p. 79.  She said she needed more than $200.  *Id.*  She said

she would "drop" the charges by writing a statement, she guessed.  *Id.*  When asked

whether she said that she would change her story, James said: "No, I didn't say that.  I

just said I would take the money." *Id.*, p. 80.  On redirect, the prosecutor established

that with regard to "the dropping of the charges," the door that was broken by Petitioner

was James's door.  *Id.*, p. 81.

Counsel for Petitioner then advised the court at the bench that he would recall

Hall and impeach James.  *Id.*, p. 82.  He said that he had "Hall's statement that she said

for money she would tell the truth, not that she would drop the charges." *Id.*  Hall was

recalled.  *Id.*, p. 84.  Hall said she was present on August 20, 2004, at the apartment of

Alicia Davis; she was not involved in the conversation, but overheard some of the

conversation between Davis and James. *Id.*, pp. 84-85. She said that she heard

James say that she (James) would change her story about what had occurred. *Id.* Hall

said she heard James say that if Petitioner would "give her the money or whatever she

will tell the truth what really happened, something like that." *Id.*

**Petitioner's claim**

Petitioner asserts that the fourth ground he raised in his Rule 3.850 motion is the

claim now presented to this court. Doc. 1, p. 4. He asserts that his attorney was

ineffective for failing to depose or present testimony from Alicia Davis. *Id.* Petitioner

asserts that:

> James [t]old Davis that if Defendant would pay her (James) $200.00 she
> would tell the truth in court that the Defendant was invited in to the
> apartment and not that he forced his way into the apartment. Davis called
> Defendant on the phone and an agreement was made. Later on Davis
> received another visit from James demanding more money. Davis again
> called Defendant but instead of relaying the message from James, Davis
> told Defendant not to worry about paying James because she (Davis) and
> Hall were going to the State's Attorney Office and were going to tell them
> what Shayla James said.

*Id.* Petitioner then alleges that the prosecutor "filed an amended answer to demand

discovery containing Davis' address and here [sic] statements." *Id.* Petitioner contends

that he asked his attorney to call Davis as a witness and represented that she was

available and would testify to these facts. *Id.* Davis did not testify. *Id.*, p. 5. Petitioner

asserts that Davis was a crucial witness because proof that he was not invited into the

apartment was essential to the charge of burglary. *Id.*, p. 6.

Petitioner asserts that Davis would have rebutted the testimony of James at trial,

that Petitioner "offered to 'buy her off' to 'drop the charges.' " *Id.* He asserts that Davis

would have said that it was James that brought up the issue of payment for telling the truth.

Petitioner also asserts that the subpoena attached to the trial court's order was issued on December 1, 2004, and included Alicia Davis, but with her address in Tallahassee lined through. *Id.*, p. 6. He asserts that the prosecutor filed an amended discovery motion, listing the address of Davis in Quincy, Florida. *Id.* He questions why Davis was not served at her Quincy address. *Id.* Further, he points out that there is no return of service of the subpoena, and thus there was no evidence that Davis was even aware of the subpoena. *Id.* He asserts that the Rule 3.850 court should have inquired more thoroughly into these evidentiary gaps and discrepancies. *Id.*

The state circuit court denied this claim without a hearing. Ex. H, p. 38. The court wrote: "However, counsel did subpoena Ms. Davis for trial, [footnote omitted] but she failed to appear." *Id.* The court then reasoned: "The failure of a witness to appear in response to a subpoena does not render counsel ineffective." *Id.* The subpoena was to have been attached to the order, *id.*, fn. 1, but is not attached to that order in this record. *Id.* It was attached, however, to Respondent's response to the Rule 3.850 motion and is in this record. *Id.*, p. 35.

Respondent concedes that state court remedies were exhausted as to the claim that Alicia Davis would have testified that Shayla James told her that she invited Petitioner into her apartment. Doc. 12, p. 7. Respondent argues, however, that other specifics (that James asked Petitioner to give her money for testimony, not the other way around, and that the subpoena to Davis was inadequate) were not alleged in Petitioner's Rule 3.850 motion, and cannot now be considered by this court. *Id.*, p. 8.

Petitioner made the basic claim in his Rule 3.850 motion (failure of counsel to call Davis as a witness, and that Davis would have said that James told her that she (James) invited Petitioner into her apartment, Ex. H, p. 10) and the trial court denied it, relying upon a subpoena supplied to the court by Respondent.  Ex. H, p. 33. Respondent said in the response to the Rule 3.850 motion:  "Attached is a copy of a subpoena sent to Alicia Davis for the trial.  Ms. Davis failed to appear."  *Id.*  The subpoena was attached to this response.  *Id.*, p. 35.  The subpoena shows on its face that it was issued by the prosecutor, not by counsel for Petitioner.  *Id.*  It has no proof of service on Davis, and the Tallahassee address is lined through in ink.  *Id.*  Respondent presented no proof at the trial level that the subpoena had ever been served upon Davis, and the subpoena was not issued by counsel for Petitioner.  Petitioner brought the problems with the subpoena to the attention of the First District Court of Appeal when he filed his brief on appeal.  Ex. I, unnumbered page between page 1 and page 2. He repeated these claims in his motion for rehearing.  Ex. O, pp. 1-2 (doc. 25-2, pp. 2-3).  Thus, Respondent's argument that this specific claim was not presented to the state courts is unpersuasive.

However, at no point in the Rule 3.850 proceedings did Petitioner argue that there was any transaction between him and James about payment for testimony, and there was no allegation that James initiated this discussion.  Petitioner failed to exhaust state court remedies as to this allegation.  Moreover, regardless of exhaustion, this claim should be denied on the merits.  28 U.S.C. § 2254(b)(2) (quoted *supra*).

Respondent argues that the state court's decision was not contrary to, or an unreasonable application of, clearly established federal law in <u>Strickland</u>.  Doc. 12, p. 9.

Respondent first reasons that the trial court found that Davis *failed to comply* with the subpoena, and that finding of fact is entitled to a presumption of correctness. *Id.*, p. 10 n. 9. That is not so.

As noted earlier, factual determinations by the state court are presumed to be correct and Petitioner has the burden of rebutting the presumption by clear and convincing evidence. 28 U.S.C. § 2254(e)(1). If a factual issue has been adjudicated by the state court, Petitioner must show that the adjudication "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2).

The conclusion of the state court that "counsel" "did subpoena Ms. Davis for trial," Ex. H, p. 38, has been shown to be an unreasonable determination of facts in light of the evidence presented in the State court proceeding. The subpoena was not issued by defense "counsel," but by the prosecutor, and there was no evidence that it was actually served upon Davis. Indeed, the only evidence is that the Tallahassee address was apparently not sufficiently reliable because it was crossed out. The conclusion that Davis "failed to appear," Ex. H, p. 38, is entitled to deference because that fact is shown from the list of witnesses in the trial transcript. Ex. B, p. 2. But the trial court's implicit finding that Davis failed to comply with the subpoena is not. There is no evidence that the subpoena by the prosecutor was served upon Davis. This court, therefore, must either hold an evidentiary hearing as to this factual question or determine whether the petition should be denied without an evidentiary hearing.

Since there has been no evidentiary hearing, it will be assumed that Petitioner's counsel failed to subpoena Davis for trial and that his failure was the reason that Davis

did not testify.  It is noted that Petitioner did not present to the state court the details of

the testimony of Davis or an affidavit of Davis, so he failed to develop this critical fact in

state court.[3]  § 2254(e)(2).  It will be assumed, however, that Davis would have testified

as alleged by Petitioner in this court.  The question, then, is whether Petitioner has

shown that this was attorney error causing prejudice to the outcome.  He has not.

At trial, James admitted that she told Hall that she would "drop the charges" if

Petitioner would pay her money.  While she denied that she would tell the "truth" if she

were paid money by Petitioner, her admission that she said she would "drop the

charges" for money was significant evidence in Petitioner's favor.  The phrase "drop the

charges" is commonly used to indicate an unwillingness to testify in court against a

defendant.  This, standing alone, was evidence damaging to James as a witness.

Moreover, Hall was recalled as a witness and she said that James had said, in front of

Davis, that she (James) would "tell the truth" if Petitioner would give her money.  Thus,

everything that Davis might have said was already heard by the jury.  Testimony from

Davis as alleged by Petitioner here would not have changed the outcome.

This is especially true when the testimony of Hall, Nealy, and James is

considered.  Their testimony was that they met Petitioner on the street, he insisted on

talking with Hall, Hall said no, and Hall, Nealy, and James went to James's apartment.

Nealy saw Petitioner outside, so he must have followed Hall to the apartment.

Petitioner then loudly and repeatedly knocked on the door.  Hall hid, obviously in fear,

---

[3] Aldrich v. Wainwright, 777 F.2d 630, 636-37 (11th Cir. 1985), *cert. denied*, 479 U.S. 918 (1986) (defendant's conclusory allegations about the testimony of uncalled witnesses are insufficient to state a claim of ineffective assistance of counsel).

and Nealy told Petitioner that Hall was not there. Davis would not have rebutted any of this evidence. She was not there and did not see and her any of it. Hall, Nealy, and James all testified that Petitioner entered the apartment, broke the door of the bedroom to get to Hall, and beat her repeatedly, breaking a bone in her face and causing damage to her eye. Davis could not have provided evidence to rebut this either since she was not there. Even if Davis had testified that James had said that the "truth" was that she invited Petitioner into the apartment, no jury, in light of the eye-witness testimony to the series of events leading to the vicious attack on Hall, would have believed that Petitioner was invited into the apartment. Counsel was not ineffective for failing to call Davis as a witness.

## Conclusion

Accordingly, it is **RECOMMENDED** that 28 U.S.C. § 2254 petition for writ of habeas corpus filed by Michael Bronson challenging convictions for burglary of a dwelling with a person assaulted and felony battery causing great bodily harm, in the Circuit Court of the Second Judicial Circuit, in and for Gadsden County, Florida, case number 04-123CFA, be **DENIED WITH PREJUDICE**.

**IN CHAMBERS** at Tallahassee, Florida, on November 20, 2009.


s/    William C. Sherrill, Jr.
WILLIAM C. SHERRILL, JR.
UNITED STATES MAGISTRATE JUDGE



## NOTICE TO THE PARTIES

**A party may file specific, written objections to the proposed findings and recommendations within 15 days after being served with a copy of this report and recommendation. A party may respond to another party's objections within 10 days after being served with a copy thereof. Failure to file specific objections limits the scope of review of proposed factual findings and recommendations.**